### UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION AT COLUMBUS

| | | |
|---|---|---|
| *In re*: | : | |
| | : | Case No. 10-58583 |
| GEORGE A. BAVELIS, | : | Chapter 11 |
| | : | Judge Hoffman |
| *Debtor*. | : | |
| | : | |

| | | |
|---|---|---|
| | : | |
| George A. Bavelis, *et al.*, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Adv. Pro. No. 10-2508 |
| | : | |
| Ted Doukas, *et al.*, | : | |
| | : | |
| *Defendants*. | : | |

### AMENDED BENCH DECISION AWARDING GEORGE A. BAVELIS ATTORNEYS' FEES AND EXPENSES THAT HE WOULD NOT HAVE INCURRED BUT FOR THE BAD-FAITH LITIGATION CONDUCT OF GARY A. GOLDSTEIN, TED DOUKAS AND QUICK CAPITAL OF LONG ISLAND CORP.

This matter is before the Court in the Chapter 11 case of George A. Bavelis and the adversary proceeding he commenced against several parties, including Ted Doukas and Quick Capital of Long Island Corp. ("Quick Capital"). On February 22, 2017, the Court issued its Opinion and Order (A) Determining that Gary A. Goldstein, Ted Doukas and Quick Capital of Long Island Corp. Have Engaged in Sanctionable Misconduct and (B) Establishing Procedures for Determining the Amount of the Sanctions (the "Sanctions Opinion") (Adv. Doc. 684). *Bavelis v. Doukas (In re Bavelis)*, 563 B.R. 672 (Bankr. S.D. Ohio 2017). The findings of fact and conclusions of law set forth in the Sanctions Opinion are adopted and incorporated by reference into this bench decision in their entirety.

I certify that this is a
copy of the original,
4/24/20 7
Clerk of the Bankruptcy Court
Deputy Clerk
5/16/17

In the Sanctions Opinion, the Court concluded that Gary A. Goldstein, Doukas and Quick

Capital (collectively, the "Respondents") engaged in bad-faith litigation conduct. To summarize:

> Earlier in the case, Doukas sought to establish that one of his wholly
> owned companies, Quick Capital . . . , held a $14 million secured
> claim against Bavelis's bankruptcy estate. But unbeknownst to
> Bavelis, Doukas had already caused Quick Capital to assign its
> interest in the note and security agreement on which the claim was
> based to Socal Capital LLC ("Socal"), a company in which Doukas
> had no interest. . . . Goldstein, counsel for Doukas and Quick
> Capital, admits that he became aware of the assignment [(the
> "Assignment")] soon after Doukas executed it.
>
> Fully aware of the [A]ssignment, [the Respondents] engaged
> in a two-year long pattern of deception designed to conceal the
> [A]ssignment from Bavelis and the Court. They failed to produce the
> [A]ssignment in response to multiple document requests that should
> have elicited it, and they even sent Bavelis's counsel discovery
> responses stating that no responsive documents existed. The
> Respondents concede that Quick Capital was no longer a creditor
> post-[A]ssignment, yet they filed several documents with the Court
> . . . that identified Quick Capital as a creditor after Doukas executed
> the [A]ssignment. The Respondents then participated in a four-day
> hearing in which they attempted, without once mentioning the
> [A]ssignment, to establish that Quick Capital held a secured claim.

*Bavelis*, 563 B.R. at 674.

The Sanctions Opinion provided that, under § 105(a) of the Bankruptcy Code and the Court's

inherent authority, the Respondents would be required to pay the attorneys' fees and expenses that

Bavelis incurred as a result of their bad-faith litigation conduct. The Sanctions Opinion also

provided that Goldstein, who was admitted to practice law before the Court before his admission *pro*

*hac vice* was revoked based on the conduct summarized above, would be sanctioned under 28 U.S.C.

§ 1927. The Court directed Bavelis to file a fee statement establishing that the fees and expenses

he seeks to recover from the Respondents were incurred due to the bad-faith misconduct described

in the Sanctions Opinion. The Court also provided the Respondents an opportunity to file objections to any fee statement submitted by Bavelis.

On March 2, 2017, the Court held a telephonic status conference at which it detailed its expectations regarding any fee statement Bavelis anticipated filing. Bavelis then filed a fee statement (the "Fee Statement") (Adv. Doc. 695) in which he divided the requested fees and expenses into nine categories. The Respondents filed objections (Adv. Docs. 700 & 701) (respectively, the "Goldstein Objection" and the "Doukas Objection") as well as a notice of supplemental authority (Adv. Doc. 705). Two of Bavelis's attorneys—Richard Stovall and Chris Hogan—and an expert witness, Larry McClatchey, previously testified regarding the attorneys' fees incurred by Bavelis. Each of the Respondents has entered into certain stipulations with Bavelis, including a stipulation that the testimony of Stovall, Hogan and McClatchey would be admissible for purposes of the hearing on the amount of sanctions that should be imposed. Adv. Doc. 692 at 2–3; Adv. Doc. 694 at 2–3.

On April 20, 2017, the Court conducted a hearing on the Fee Statement and the Respondents' objections. Hogan testified in support of the Fee Statement, including the minor modifications made thereto based on his further review following the submission of the Fee Statement. After making those modifications and adding the fees incurred in drafting the Fee Statement and preparing for the hearing, the amount of fees and expenses that Bavelis seeks is $532,406.31.

During the hearing on the Fee Statement, Bavelis's Exhibits 2–7 and 11–12 were admitted into evidence without objection. Neither Quick Capital nor Doukas (who was not present at the hearing) presented evidence in support of their objections; they instead relied only on argument of their counsel. Goldstein, who is acting pro se in this matter, filed a notice (Adv. Doc. 702) stating

that he did not did intend to appear at the hearing.  Consistent with the notice, Goldstein did not

attend the hearing.

This is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court has the subject matter

jurisdiction to hear and determine this matter under 28 U.S.C. §§ 157 and 1334 and the general order

of reference entered in this district.  In addition, the Court has the authority to impose compensatory

sanctions against the Respondents, *see Grossman v. Wehrle (In re Royal Manor Mgmt.)*,

652 F. App'x 330, 341–42 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 831 (2017), including the

constitutional authority to do so, *see Messer v. Magee (In re FKF 3, LLC)*, 2016 WL 4540842, at

*14 (S.D.N.Y. Aug. 30, 2016).  The only remaining question is the amount of attorneys' fees that

should be awarded to Bavelis.

The answer to that question must be informed by the United States Supreme Court's recent

decision in *Goodyear Tire & Rubber Co. v. Haeger*, — S. Ct. —, No. 15-1406, 2017 WL 1377379,

at *5 (Apr. 18, 2017).  In *Goodyear*, the Supreme Court held that:

> [A] federal court's inherent authority to sanction a litigant for
> bad-faith conduct by ordering it to pay the other side's legal fees. . .
> is limited to the fees the innocent party incurred solely because of the
> misconduct—or put another way, to the fees that party would not
> have incurred but for the bad faith.
>
> . . .
>
> This but-for causation standard generally demands that a
> district court assess and allocate specific litigation expenses—yet still
> allows it to exercise discretion and judgment.  The court's
> fundamental job is to determine whether a given legal fee—say, for
> taking a deposition or drafting a motion—would or would not have
> been incurred in the absence of the sanctioned conduct. The award is
> then the sum total of the fees that, except for the misbehavior, would
> not have accrued.  But trial courts undertaking that task need not, and
> indeed should not, become green-eyeshade accountants (or whatever
> the contemporary equivalent is).  The essential goal in shifting fees

is to do rough justice, not to achieve auditing perfection. Accordingly, a district court may take into account [its] overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. The court may decide, for example, that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct. And such judgments, in light of the trial court's superior understanding of the litigation, are entitled to substantial deference on appeal.

*Goodyear*, 2017 WL 1377379, at *3, 6 (citations and internal quotation marks omitted).

In an attempt to escape any liability whatsoever for the attorneys' fees requested by Bavelis, the Respondents rely on the fact that no one knows with absolutely certainty how things would have played out had they not concealed the Assignment. But while "causation cannot be based upon speculative or conjectural proof," it can be grounded on "sufficient evidence in the record [that] permit[s] the [trial] court, as the trier of fact, to reasonably infer that [an event] would not have occurred but for" the conduct of a party. *DePalma v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 40 F. App'x 187, 195 (6th Cir. 2002). In order for such an inference to be reasonable, there must be "substantial evidence from which [the trier of fact] may conclude by a preponderance of the evidence that, but for [one party's] conduct, the [the other party's] injuries would not have occurred." *Estate of Triplett v. Gen. Elec. Co.*, 954 F. Supp. 149, 153 (W.D. Mich. 1996) (citing *Am. & Foreign Ins. Co. v. Gen. Elec. Co.*, 45 F.3d 135, 140 (6th Cir. 1995)).[1] And here, there is

---

[1] In the Sanctions Opinion, the Court found "by clear and convincing evidence that the Respondents engaged in egregious, bad-faith conduct in multiple ways." *Bavelis*, 563 B.R. at 688. Once liability for bad-faith conduct is found by clear and convincing evidence, the party seeking sanctions must prove the amount to which he is entitled by a preponderance of the evidence. *Cf. McGregor v. Chierico*, 206 F.3d 1378, 1386–87 (11th Cir. 2000) (holding that a plaintiff that has established the elements of contempt by clear and convincing evidence need only prove damages by a preponderance of the evidence); *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1318 (10th Cir. 1998) (same); *In re Gen. Motors Corp.*, 110 F.3d 1003, 1018 (4th Cir. 1997) (same); *Graves v. Kemsco Grp., Inc.*, 864 F.2d 754, 755 (Fed. Cir. 1988) (same, applying Seventh Circuit

substantial evidence—summarized below and set forth more fully in the Sanctions Opinion—from

which the Court can conclude that Bavelis would not have incurred $257,228.31 of fees and

expenses but for the bad-faith litigation conduct of the Respondents. Starting with the categories

of fees that are recoverable and then moving to those that are not, the Court will analyze each of

Bavelis's nine categories of fees and expenses under the "but for" analysis required by the *Goodyear*

decision.

## A.     Recoverable Fees

In *Goodyear*, the Supreme Court held that courts reviewing requests for fees based on

litigation misconduct may "decide . . . that all (or a set percentage) of a particular category of

expenses . . . were incurred solely because of a litigant's bad-faith conduct." *Goodyear*,

2017 WL 1377379, at *6. Utilizing that approach here, the Court concludes that the fees Bavelis

requests in Categories 1, 3, 4 (with only limited exceptions) and 6–8 would not have been incurred

but for the Respondents' bad-faith litigation conduct.

To provide context, a bit of background is in order:

> On December 3, 2010, Quick Capital filed a proof of claim
> asserting a secured claim in the amount of $1,667,791.10 based on a
> promissory note (the "Note") and a security agreement . . . that
> Bavelis signed before [he commenced his bankruptcy case]. Claim

---

law); *Cardionet, LLC v. Mednet Healthcare Techs., Inc.,* 146 F. Supp. 3d 671, 693 (E.D. Pa. 2015)
("[T]hose federal Courts of Appeals that have considered the issue have uniformly held contempt
damages need only be established by a preponderance of the evidence. Absent controlling precedent
from the Third Circuit, this Court will follow the weight of federal appellate authority and evaluate
CardioNet's claimed damages under the preponderance of the evidence standard." (citations
omitted)). There is contrary authority. *See Nelson Tool & Mach. Co. v. Wonderland Originals, Ltd.,*
491 F. Supp. 268, 269 (E.D. Pa. 1980) ("Damages for civil contempt, as well as liability, must be
also proven by clear and convincing evidence."). That said, Bavelis has carried his burden of
proving that he would not have incurred the fees awarded in this bench decision but for the
Respondents' bad-faith litigation conduct even under the clear and convincing evidence standard.

> 49-1. Several months later, Quick Capital filed an amended proof of
> claim based on the same loan documents, asserting a secured claim
> in the amount of $14 million (the "Claim"). Claim 49-2. The Court
> disallowed the Claim after finding, among other things, that Doukas
> fraudulently induced Bavelis to sign the Quick Capital loan
> documents. *Bavelis v. Doukas (In re Bavelis)*, 490 B.R. 258, 284
> (Bankr. S.D. Ohio 2013) ("*Bavelis I*"), *aff'd*, No. 13-8015, 2013 WL
> 6672988 (B.A.P. 6th Cir. Dec. 19, 2013), *aff'd*, 773 F.3d 148 (6th
> Cir. 2014).

*Bavelis*, 563 B.R. at 676.

As the Court stated in the Sanctions Opinion, "Goldstein [and] Doukas [but not any principal of Socal] personally participated in a full-day settlement conference with Bavelis at the office of Bavelis's counsel in January 2012 for the purported purpose of resolving Bavelis's objection to the Claim (the "Claim Negotiations")." *Bavelis*, 563 B.R. at 681. Category 1 fees are those incurred "in preparing for and engaging in settlement negotiations with Quick Capital/Doukas, as the wrong party." Fee Statement at 10. The Respondents quibble with the time spent in this category. *See* Goldstein Obj. at 13–14 ("Just looking at the time records would reveal several thousands of dollars was expended just because Bavelis[] had several attorneys talking to each other about various settlement strategy issues."); Doukas Obj. at 11 (same). But "[t]here is no per se prohibition against awarding compensation for intra-office conferences." *In re Nicole Gas Prod., Ltd.*, 542 B.R. 204, 229 (Bankr. S.D. Ohio 2015) (quoting *In re Moss*, 320 B.R. 143, 158 (Bankr. E.D. Mich. 2005)). And the time Bavelis's attorneys spent in conferences among themselves during the negotiations was reasonable and necessary in light of what Bavelis thought he knew at the time (i.e., that Quick Capital had not assigned the Claim).

The Respondents do not contend that Lennon Stravato or Ian Chen (the principals of Socal, *Bavelis*, 563 B.R. at 685) would have participated in the negotiations. Instead, the Respondents spin

out a story as to why Bavelis would have been forced to negotiate with Doukas even if they had

disclosed the Assignment. *See* Goldstein Obj. at 13–14; Doukas Obj. at 11–12. Goldstein argues

that the "the discussions involved a global settlement resolution, including resolution of the entire

adversary case, and was not limited to resolution of solely the Quick Capital claim." Goldstein Obj.

at 13. But as the Court held in the Sanctions Opinion, "[i]f Doukas had disclosed the Assignment,

it would have been apparent to Bavelis that Doukas had nothing left to trade, and there would have

been no reason for Bavelis to negotiate with Doukas regarding the Claim." *Bavelis*, 563 B.R. at

685–86. And the Court made other extensive findings in the Sanctions Opinion establishing that:

(1) "[t]he extent of the adversity between Doukas and Socal meant that the Claim Negotiations

between Doukas and Bavelis had no chance of resolving the Claim," and (2) "if the Respondents had

disclosed the Assignment, Bavelis rightly would have resisted any suggestion that he negotiate with

Doukas with respect to the Claim, and Bavelis would not have expended resources conducting the

Claim Negotiations with Doukas." *Bavelis*, 563 B.R. at 685–86. Taken together, these findings

establish that the Category 1 fees would not have been incurred if the Respondents had disclosed

the Assignment. Bavelis therefore may recover the fees and expenses in Category 1 in the amount

of the amount originally requested ($25,179.50) minus a $725 adjustment explained by Hogan

during the hearing, for a total of $24,454.50.

Category 3 fees are those incurred "in attempting to address and/or follow-up on discovery

requests to which Respondents asserted false answers" and "also includes additional, ultimately

futile, efforts by Mr. Bavelis to obtain updated/additional responses with respect to his discovery

requests." Fee Statement at 10. In their objection to the Fee Statement, "Doukas and Quick Capital

concede that these items are causally related to the sanctionable misconduct found by this Court."

Doukas Obj. at 13. Indeed, the Category 3 fees would not have been incurred but for the Respondents' deceit during the litigation. Although Goldstein suggests that the Category 3 fees "are duplicative of the contempt fees previously awarded by the Court against Mr. Doukas," Goldstein Obj. at 16, Hogan's testimony established that this is not the case. The fees and expenses in Category 3 in the amount of $5,577.75 therefore are recoverable by Bavelis.

Category 4 fees are those incurred "in researching and preparing responses to various filings, identified [in the Sanctions Opinion] for which Quick Capital lacked creditor standing, as well as dealings with the Court and other parties/creditors with respect to the same" and "also includes fees incurred by Mr. Bavelis in responding to 'me too' submissions filed by other parties, at the urging of Doukas/Goldstein." Fee Statement at 11. The Court will address the documents filed by Quick Capital and then turn to the so-called me too filings, which were filed by the FDIC and First Southern Bank.

*The documents filed by Quick Capital.* If the Respondents had disclosed the Assignment, it would have been patently obvious that Quick Capital lacked the standing required to file the documents in which it identified itself as a creditor. Thus, the only fees Bavelis would have needed to incur (if any) would have been those necessary to point out the lack of standing. The Court will estimate the fees required to address the lack of standing to be $5,000 of the $79,602.00 requested in Category 4, leaving $74,602 in this category. The Respondents object to those fees on two grounds. Making an argument that the Court has rejected before, the Respondents contend that Doukas's and Quick Capital's status as defendants in the adversary proceeding afforded them standing to assert the arguments they made in the documents in which they identified Quick Capital as a creditor. Goldstein Obj. at 18; Doukas Obj. at 16. But as the Court explained in the Sanctions

-9-

Opinion, their position is contrary to relevant decisional authority. *See Bavelis*, 563 B.R. at 684

n.10. And during the hearing on the Fee Statement, counsel for Doukas and Quick Capital conceded

that he was not asserting that Doukas and Quick Capital had standing to file those documents.

The Respondents also argue that Socal would have filed the same documents that Quick

Capital did and that the fees in Category 4 thus were not incurred as a result of their misconduct.

Goldstein Obj. at 17–22; Doukas Obj. at 14–18. But there is absolutely no evidence in the record

establishing that Socal would have filed those documents if the Assignment had been disclosed. In

fact, the evidence is to the contrary, as the Court pointed out in rejecting this same argument when

the Respondents made it as part of their attempt to avoid a finding that they engaged in sanctionable

conduct:

> [G]iven their conflicting financial interests, it is highly unlikely that
> Socal would have conducted itself in the manner Quick Capital did.
> Socal never filed a motion for the appointment of a Chapter 11
> trustee, and Socal would not have made many of the arguments on
> which Doukas and Quick Capital relied in the other documents they
> filed [including the Disclosure Statement Objection and the
> Exclusivity Extension Objection] . . . .

*Bavelis*, 563 B.R. at 690.

The Respondents had an opportunity to offer countervailing evidence at the hearing leading

to the Sanctions Opinion, but they failed to do so. Instead, Doukas and Quick Capital attached to

their objection a purported affidavit of Lennon Stravato. But their reliance on that affidavit, being

inadmissible hearsay, is misplaced. Furthermore, the affidavit would not support their position even

if it were admissible. For while the affidavit states that Socal approved of the documents Quick

Capital filed, the affidavit does not state that Socal would have filed those documents if the

Assignment had been disclosed. Quite simply, there is a considerable difference between letting

-10-

someone else file a document and actually filing the document under pain of possible Rule 11 sanctions.

*The documents filed by the FDIC and First Southern Bank.* The Court concludes that the FDIC and First Southern Bank would not have filed their "me too" submissions but for the concealment of the Assignment. In fact, the Court previously rejected the Respondents' argument that FDIC and First Southern Bank might have pursued the appointment of a Chapter 11 trustee even if Goldstein had not urged them to do so on behalf of Doukas and Quick Capital:

> [T]here would have been nothing for the FDIC to join if Quick Capital had not filed the Trustee Motion in the first place, and the FDIC in fact filed its joinder only after its counsel received strenuous urging to do so from Goldstein. As for First Southern Bank, Goldstein conceded that it likewise filed its motion for the appointment of a trustee only after he encouraged its counsel to do so. Like other parties in interest, the FDIC and First Southern Bank were operating under the false pretense created by the Respondents that Quick Capital had standing to seek the appointment of a Chapter 11 trustee. Had they known the truth—and the Trustee Motion itself would have revealed the truth if the Respondents had not once again lied when they filed it—the FDIC and First Southern Bank may well have declined to seek the appointment of a Chapter 11 trustee.

*Bavelis*, 563 B.R. at 691. For all these reasons, $74,602 of the fees and expenses in Category 4 would not have been incurred by Bavelis but for the Respondents' bad faith. Bavelis therefore may recover the fees in Category 4 in that amount.

Category 6 "includes fees incurred by Mr. Bavelis in investigating, advising the Court, and ultimately, addressing by way of a stipulated order, Quick Capital's improper status and the substitution of SoCal." Fee Statement at 11. The Respondents contend that these fees should be limited because "once Bavelis learned of the [A]ssignment and advised the Court in a conference call/status conference, steps were immediately taken by Attorney Goldstein and the Doukas

-11-

Defendants to do what was requested of them." Goldstein Obj. at 23; Doukas Obj. at 19. As the Court stated in the Sanctions Opinion, "because Goldstein undertook his remedial efforts only after Bavelis uncovered the Assignment and brought it to the Court's attention, the efforts in no way make him any less culpable for concealing the Assignment." *Bavelis*, 563 B.R. at 693. And by the same token, Goldstein's remedial efforts in no way erase the fees that were incurred by Bavelis's counsel as part of their efforts to "address the manner in which the concealment of the Assignment had muddled and disrupted the litigation over the Claim." *Id.* at 686. The Category 6 fees would not have been incurred but for the Respondents' concealment of the Assignment to Socal, and the fees and expenses in Category 6 in the amount of $18,901.50 therefore are recoverable by Bavelis.

Category 7 includes fees incurred by Bavelis "in researching, preparing submissions with respect to, and participating in court proceedings regarding the revocation of Mr. Goldstein's pro hac vice admission." Fee Statement at 11. Goldstein contends that revocation of his admission *pro hac vice* constitutes "adequate sanctions." Goldstein Obj. at 24. But revoking his admission *pro hac vice* did not compensate Bavelis for the fees he incurred in connection with the revocation. And the facts that gave rise to the revocation of Goldstein's admission *pro hac vice* also form the basis for the imposition of monetary sanctions against the Respondents. Thus, in light of Goldstein's involvement in the concealment of the Assignment, it was reasonable for Bavelis's attorneys to take a position on the revocation issue. For his part, Doukas argues that if anyone should be charged for these fees, it should be Goldstein. But Doukas chose Goldstein as his attorney and fully participated in the scheme that led to the revocation of Goldstein's admission *pro hac vice*. *See Bavelis*, 563 B.R. at 691–92. For all these reasons, the Category 7 fees and expenses in the amount of $28,136

would not have been incurred but for *all* of the Respondents' misconduct, and the fees therefore are recoverable by Bavelis from each of them.

Category 8 includes fees incurred in "researching and submitting briefing . . . regarding [Bavelis's] request for sanctions" as well as fees incurred by Bavelis "in preparing for and participating in hearing(s) related to such request, and the preparation of post-hearing briefing regarding the same." Fee Statement at 11. As counsel for Bavelis stated during the hearing on the Fee Statement, the Respondents have—despite the indisputable egregious nature of their misconduct—fought at every turn not to be sanctioned. Of course, the fees Bavelis has incurred fighting this unnecessary battle would not have been incurred but for the Respondents' misconduct, and they do not seriously contend otherwise. Rather, the Respondents argue that the amount of fees requested is excessive because "[t]he power to assess sanctions is a component of the inherent power of this Court" and "[t]he issue, thus, is between the Court and the attorney or party acting in bad faith." Goldstein Obj. at 24; Doukas Obj. at 20. That might be true if the Court were imposing punitive sanctions, but it most certainly is not true where, as here, the sanctions being imposed are compensatory. The Category 8 fees and expenses in the amount of $70,465.56 would not have been incurred but for the Respondents' bad-faith conduct, and the fees therefore are recoverable by Bavelis.

Hogan also testified that the fees incurred drafting the Fee Statement and preparing for the hearing equal $35,091. *See also* Ex. 11. Those fees clearly would not have been incurred but for the Respondents' bad-faith conduct.

In total, $257,228.31 of fees and expenses would not have been incurred but for the Respondents' bad-faith conduct. Furthermore, this amount of fees was reasonably and necessarily

incurred by Bavelis's counsel. Stovall, Hogan and McClatchey previously testified in support of
the fees and expenses incurred by Bavelis's counsel and, as noted above, the Respondents stipulated
to the admissibility of this testimony. Stovall testified in support of the fees charged by Bavelis's
bankruptcy counsel, Allen Kuehnle Stovall & Neuman LLP ("Allen Kuehnle") and certain other
costs, while Hogan testified in support of the fees and expenses charged by Bavelis's special
litigation counsel, Zeiger, Tigges & Little LLP ("Zeiger Tigges"). Hogan testified again during the
hearing on the amount of the sanctions. He explained that he took the primary responsibility for
preparing the Fee Statement in accordance with the Court's direction during the earlier status
conference. It was clear that he prepared the Fee Statement in a meticulous fashion. Put differently,
he did what the Supreme Court has made clear that courts reviewing fee statements "need not, and
indeed should not [do], become green-eyeshade accountants (or whatever the contemporary
equivalent is)." *Goodyear*, 2017 WL 1377379, at *6.

At a prior hearing, McClatchey testified as an expert witness in support of the reasonableness
of those fees. McClatchey has been licensed to practice law since 1975 and is a partner in the firm
of Kegler, Brown, Hill & Ritter in Columbus, Ohio, serving as the chair of the firm's Creditors'
Rights and Bankruptcy practice group. He is a panel Chapter 7 trustee in the Southern District of
Ohio and has served as a trustee in more than 10,000 bankruptcy cases. He also has served as a
Chapter 11 trustee. In his capacity as a trustee, McClatchey has extensive experience in reviewing
fee requests in order to assess their reasonableness. Based on this experience, McClatchey testified
that the rates charged by the Allen Kuehnle and Zeiger Tigges professionals are reasonable and
customary for similarly situated professionals in bankruptcy cases and adversary proceedings in the
Columbus area and that the services were reasonably necessary. Relying on the testimony of

Stovall, Hogan and McClatchey—each of which the Court found to be highly credible—as well as its own knowledge and experience, the Court concludes that the time expended by Allen Kuehnle and Zeiger Tigges was reasonable and necessary and their hourly rates are consistent with the "prevailing market rate," that is, the rate that professionals of "comparable skill and experience can reasonably expect to command. *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir. 2013) (internal quotation marks omitted).

**B.     Fees that Are Not Recoverable**

Bavelis, however, has not carried his burden of proving by a preponderance of the evidence that his attorneys would have avoided accruing the amount of fees set forth in Categories 2, 5 and 9 were it not for the Respondents' bad-faith litigation conduct. To the contrary, it is likely that the amounts of those fees would have accrued even if the Respondents had revealed the Assignment to Bavelis as soon as it was signed. Thus, those fees are not recoverable by Bavelis, because he has not shown a direct causal connection between the incurrence of such fees and the Respondents' misconduct.

The fees in Categories 2, 5 and 9 relate to the April 2012 hearing on Bavelis's objection to the Claim (the "Claim Objection Hearing"): Taken in chronological order, Category 5 includes fees related to pre-Claim Objection Hearing matters, such as those incurred by Bavelis in responding to Quick Capital's motion for summary judgment; Category 9 includes fees incurred preparing for and participating in the Claim Objection Hearing and related post-hearing briefing; and Category 2 includes fees incurred in response to Quick Capital's and Doukas's appeals from *Bavelis I.* Fee Statement at 10–12. Bavelis cannot recover the fees in those three categories for several reasons.

-15-

As an initial matter, contrary to the argument made by Bavelis's counsel during the hearing on the Fee Statement, this is not one of those "exceptional cases" in which a court may "shift all of a party's fees . . . in one fell swoop." *Goodyear*, 2017 WL 1377379, at *6. It is important to keep in mind that the Supreme Court's recognition that there are "exceptional cases" in which all litigation fees are recoverable in no way negates the requirement that the fees be incurred "because of, and solely because of, the misconduct at issue (however serious, or concurrent with a lawyer's work, it might have been)." *Id.* at *7. Instead, the exceptional cases are those in which little if any of the fees would have been incurred were it not for the bad-faith conduct. For example, in *Chambers v. NASCO*, the sanctioned party, among other things, intentionally withheld information from the court, consistently disobeyed court orders, and generally "devise[d] a plan of obstruction, delay, harassment, and expense." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 36–41 (1991). Under those circumstances—circumstances in which the substantial fees and expenses were caused "*solely by* the relentless, repeated fraudulent and brazenly unethical efforts" of the sanctioned party throughout the *entire* course of the litigation—it was appropriate for the trial court to award fees covering the entire litigation. *Id.* at 45, 58 (emphasis added). Put differently, the entire cost of the litigation would not have accrued were it not for the sanctioned party's misconduct. For the reasons explained below, Bavelis has not shown that the litigation with respect to the Claim would simply have gone away were it not for the Respondents' bad-faith conduct, and this accordingly is not one of the "exceptional" cases that the Supreme Court recognized in *Goodyear*.

First, the Court finds that, if the Assignment had been disclosed and Socal had been substituted as the proper party in interest, it is more likely than not that the litigation over the Claim would have still gone forward. Socal purchased the Claim from Quick Capital for between $1.3 and

$1.8 million—no small investment. *Bavelis*, 563 B.R. at 676–77. The Court finds it unbelievable that, faced with Bavelis's objection to the Claim, Socal would not have litigated the validity of the Claim. Bavelis concedes in the Fee Statement that "no one knows whether any or all of [the fees incurred in connection with the Claim Objection Hearing] would have been incurred had the SoCal assignment been properly disclosed in the first instance." Fee Statement at 12. But, he argues, he does know what Socal did once it finally was substituted in: it dismissed the appeal of *Bavelis I* and it compromised with Bavelis on the other claim against him that Socal had purchased (i.e., the claim filed by Independent Bankers' Bank of Florida, *see Bavelis*, 563 B.R. at 679, 694–97). Bavelis suggests that, consistent with Socal's other actions, Socal would not have litigated the Claim at all and instead would have settled with Bavelis. But Bavelis has "not shown that [the Claim] litigation would have settled as soon as [the Respondents] divulged the [Assignment]." *Goodyear*, 2017 WL 1377379, at \*8. And the possibility that Socal *might* have settled is not sufficient to establish but-for causation. Indeed, the very argument that "the suit probably would have settled 'much earlier,'" absent any real support, was ultimately rejected by the Supreme Court in *Goodyear*. *Id.* The Supreme Court held that this "limited finding" of the district court was "itself subject to grave doubt, even taking into account the deference owed to the trial court." *Id.*

A similar finding here would also be subject to considerable doubt. Bavelis suggests that Socal's dismissal of the appeal of *Bavelis I* indicates that it would never have participated in the litigation in the first place. The Court cannot make such a finding for several reasons. For one, it is telling that Socal did not immediately dismiss the appeal and proceeded with oral arguments before the Bankruptcy Appellate Panel (the "BAP"). Further, at the point at which it dismissed the appeal, Socal was faced with a lengthy decision from this Court—which had been affirmed by the

-17-

BAP—detailing the fraudulent conduct and lack of consideration underlying the issuance of the Note. A decision to not proceed with the appeal to the Sixth Circuit does not mean Socal would never have litigated the Claim. Again, having paid between $1.3 and $1.8 million for the Claim, it almost certainly would have engaged in litigation with respect to the Claim. The Court also does not find Socal's actions with respect to the claim it purchased from IBB to be revealing. The actions Socal took to compromise an entirely different claim, accompanied by different incentives and different defenses, sheds little light on the question of whether Socal would have settled the dispute over the Claim it purchased from Quick Capital. For these reasons, it would be far too speculative for the Court, on the evidence before it, to find that disclosure of the Assignment to Socal would have led to a settlement.

Further, Bavelis would have incurred most (if not all) of the fees associated with the Claim Objection Hearing even if Socal *had* settled the dispute over the Claim. As Goldstein and counsel for Doukas and Quick Capital point out in their objections, "there were numerous issues which were necessarily tried during the April 2012 [Claim Objection Hearing] which directly affected Bavelis'[s] claims against . . . the Doukas Defendants," and "[t]his same testimony and evidence was relied upon by the Court in the [September 2015] trial of all the remaining counts and necessarily truncated [that trial] considerably." Doukas Obj. at 21; Goldstein Obj. at 25. Articulating the standard for awarding fees when faced with a lawsuit involving both frivolous and non-frivolous claims, the Supreme Court in *Fox v. Vice* noted:

> Vice's attorneys would have done much the same work even if Fox had not brought his frivolous claims. . . . [because the] claims were "interrelated." The charges "arose out of the same transaction" . . . and their "defense entailed proof or denial of essentially the same facts." It therefore seems likely that Vice's attorneys would at least have conducted similar fact-gathering activities—taken many of the

-18-

> same depositions, produced and reviewed many of the same
> documents, and so forth. Indeed, the District Court highlighted the
> usefulness of the attorneys' work to defending against the state-law
> claims: In its order remanding those claims, the court noted that the
> "trial preparation, legal research, and discovery" done in the federal
> court could "be used by the parties in the state court proceedings."

*Fox v. Vice*, 563 U.S. 826, 839 (2011).

So too here. During the Claim Objection Hearing, the parties tried numerous factual and legal issues that were highly related to and arose out of the same transaction as the remaining claims in Bavelis's complaint—claims that gave rise to a nearly $1.2 million judgment. *See* Adv. Doc. 685 (proposed findings of fact and conclusions of law on remaining claims in the adversary proceeding).[2] And the evidence presented during the Claim Objection Hearing formed the basis for the Court's findings. Had those facts and conclusions not been established at the Claim Objection Hearing, Bavelis and his attorneys would have been forced to establish them during the trial on the remaining counts. So, if Bavelis had not incurred these fees in 2012, he would have had to do so at some later time. The Court cannot relieve Bavelis of regular litigation costs just because the Respondents' bad faith misconduct in concealing the Assignment to Socal required that litigation to happen sooner. *Fox*, 563 U.S. at 837. The Court therefore cannot find that the fees related to the Claim Objection Hearing—those fees in Categories 2, 5, and 9—would not have been incurred "but for" the Respondents' nondisclosure.

The Court will briefly address an argument Bavelis raised at the Hearing with respect to certain of the Category 2 fees—specifically, Doukas's appeal of *Bavelis I* to the Sixth Circuit. That

---

[2]The proposed findings of fact and conclusions of law, together with the Doukas defendants' objections thereto and Bavelis's responses, have been transmitted to the District Court. The District Court has assigned Case No. 17-327 to that matter.

appeal was based on this Court's rejection of an alternative claim Doukas asserted during the Claim

Objection Hearing against Bavelis for violation of Florida securities laws (the "Securities Claim").

*See In re Bavelis*, 773 F.3d 148 (6th Cir. 2014). Doukas had not filed a proof of claim on the

Securities Claim and had not asserted it as a counterclaim in the adversary proceeding. Bavelis

accordingly reasons that, but for the Respondents' concealment of the Assignment, Doukas would

have lacked a forum in which to assert the Securities Claim. This argument is not well taken. First,

it is worth noting that Bavelis did not object to Doukas's assertion of the Securities Claim as an

untimely proof of claim or as a compulsory counterclaim that he had waived. Instead, Bavelis

defended the claim on the merits. And given the extent to which Doukas fought for the Securities

Claim tooth and nail to the bitter end, the Court finds it likely that the litigation resulting from that

claim would have occurred in one form or another.

The Court finds that Bavelis has not shown a direct causal connection between the incurrence

of the fees in Categories 2, 5, and 9 and the Respondents' misconduct, and accordingly holds that

these fees, totaling $270,236, are noncompensable.

For all these reasons, the Court awards Bavelis $257,228.31 in fees and expenses. Counsel

for Bavelis shall, consistent with the Sanctions Opinion and this bench decision, upload a final

judgment in favor of Bavelis and against the Respondents holding them liable for their bad-faith

litigation conduct and awarding Bavelis fees and expenses in the amount of $257,228.31.

Dated: Columbus, Ohio
     April 24, 2017                      /s/ John E. Hoffman, Jr.
                                         United States Bankruptcy Judge

Copies to:

Default List
Attorneys for Plaintiffs
Attorneys for Defendants

Franklin C. Davis, Esq., Counsel for Quick Capital and Doukas (electronically)
Kevin R. Conners, Esq., Counsel for Gary Goldstein (electronically)
Gary A. Goldstein, Esq., 111 South Calvert St., Baltimore, MD 21201
Gary A. Goldstein, Esq., 1710 Lands End Road, Manalapan, FL 33462
Ted Doukas, 70 Split Rock Road, Syosset, NY 11791
Ted Doukas, 4713 Villa Mare Lane, Naples, FL, 34103-3473
Ted Doukas, 19202 Cloister Lake Lane, Boca Raton, FL 33498-4856
Quick Capital of L.I. Corp., c/o Ted Doukas, Registered Agent,
    70 Split Rock Road, Syosset, NY 11791
Attorney Grievance Commission of Maryland, 200 Harry S. Truman Parkway,
    Suite 300, Annapolis, MD 21401

# # #